# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 19, 2011

## STATE OF TENNESSEE v. NICHOLAS SHAWN MARSHALL

**Direct Appeal from the Circuit Court for Marshall County**
**No. 09-CR-82    Robert Crigler, Judge**

---

**No. M2010-01090-CCA-R3-CD - Filed August 3, 2011**

---

The defendant, Nicholas Shawn Marshall, stands convicted of rape, a Class B felony.  The trial court sentenced him as a Range II, violent offender to fifteen years in the Tennessee Department of Correction.  On appeal, the defendant argues that the trial court erred in admitting hearsay and that the evidence was insufficient to support his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined and CAMILLE R. MCMULLEN, J., concurring in results only.

Gregory D. Smith (on appeal), Clarksville, Tennessee, and Donna Orr Hargrove, District Public Defender, Michael Collins, William Harold, and Stephanie Barca, Assistant Public Defenders (at trial), Shelbyville, Tennessee, for the appellant, Nicholas Shawn Marshall.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Weakley E. Barnard and Chris Collins, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

A Marshall County jury returned an indictment on September 23, 2009, charging the defendant, Nicholas Shawn Marshall, with two counts of rape, which were alternate theories of sexual penetration without consent and sexual penetration while the victim was mentally incapacitated or physically helpless.  The court held a jury trial on February 4 and 5, 2010.

The victim testified that she was twenty-two years old at the time of the offense and lived in Lewisburg, Tennessee. She knew the defendant through his step-brother, Daniel Proctor. She and Daniel Proctor lived together for three and one-half years, until she ended the relationship in March 2009. They had a three-year-old son, who lived with her. The victim said that she first saw the defendant in May 2009, but no one introduced them and they did not speak. She did not see him again until June 6, 2009.

The victim testified that her son's birthday was June 5, and Daniel Proctor spent the night of June 5 at her apartment with her and her son. She said that they did not sleep together that night. On the morning of June 6, she, Daniel Proctor, and their son went shopping. At approximately 1:00 p.m., they met Daniel Proctor's father, Johnny Proctor, and his step-brother, the defendant, at "the rock crusher," a rock quarry lake where the public swam and fished. Daniel Proctor introduced her to the defendant, and they had a brief conversation. She had invited her friends Eric Wood, Denise Tosch, and Cherry Bishop to join them at the quarry. She said that Mr. Wood and Ms. Tosch were her neighbors, and they arrived soon after she did. Ms. Bishop and her two-year-old daughter arrived at approximately 2:30 p.m. and stayed for a short time. She recalled that they were split into two groups: her friends and herself in one group and the defendant, Daniel Proctor, and Johnny Proctor in a second group. She said that she had one twelve-ounce beer while her friends were at the quarry.

The victim testified that after her friends left, she joined the Proctors and the defendant. She, Daniel Proctor, and the defendant went to a store in her vehicle to buy a case of beer and returned to the quarry. The victim recalled Daniel Proctor and the defendant conversing in the car, but she did not talk to the defendant at that time. She had a second twelve-ounce beer after they returned from the store. Later, she and the defendant left the quarry to get a pizza. She recalled that the defendant drove Johnny Proctor's car, and she went with him because no one else wanted to go. She testified that she did not "think of any harm in going to the store with him" because he was Daniel Proctor's brother. The victim said that they talked about Daniel Proctor and her relationship with him during the drive. After they returned to the quarry with the pizza, the group made plans for the evening. Daniel Proctor asked her to take the defendant to her apartment while he went with his father to get a change of clothes. She said that Daniel Proctor told her that he would send her a text message when he was ready for the evening. The victim said that she, the defendant, and her son left the quarry between 5:30 and 6:00 p.m.

The victim testified that they went to Ms. Bishop's house because Ms. Bishop was going to babysit her son for the evening. The defendant went with her into Ms. Bishop's house, and he and Ms. Bishop had a conversation. Ms. Bishop gave the defendant her cell phone number. After leaving her son with Ms. Bishop, she and the defendant went to a store.

She purchased a thirty-six ounce bottle of beer, and a six-pack of beer. She testified that she did not plan on the defendant staying at her apartment for long. The victim said that she drank the large bottle of beer while she got ready for the evening. She said that she took a shower and changed clothes in her bathroom, and she locked the bathroom door so that the defendant could not come into the bathroom. The victim said that the defendant was on the couch in her living room while she was in the bathroom. When she left the bathroom, she was fully dressed in a black tank top and blue jeans. The victim said that Daniel Proctor had not sent her a text message by 7:00 or 7:30 p.m. She sent him a text message to ask him where he was and whether he was going to come and pick up the defendant, but he did not respond.

The victim testified that she finished the large bottle of beer and got another beer from the refrigerator. She went outside to sit on the steps because she was upset about being left alone with the defendant. She said that she did not feel comfortable being alone with him inside the apartment. While she was outside, she continued sending text messages to Daniel Proctor, and she said that she knew that he had received the messages because her cell phone indicated that he had. She began crying, and a neighbor stopped to ask her what was wrong. She told her neighbor that she was supposed to meet Daniel Proctor, but he was not returning her messages. She also told her neighbor that he had left his brother with her. She testified that she did not have enough fuel in her car to drive the defendant to Shelbyville, where he lived. The victim said that the defendant was aware that she was upset.

The victim testified that she went to Ms. Tosch and Mr. Wood's apartment. Ms. Tosch came outside, and the victim told her about the situation. Ms. Tosch told her that she would come to her apartment later. The victim returned to her apartment, and the defendant told her that Johnny and Daniel Proctor had gone to Fayetteville and would not be coming over to her apartment. She did not know how the defendant learned that the Proctors had gone to Fayetteville, but she said that he had been sending text messages to someone. The victim testified that the defendant suggested that he could walk home, but she told him that he could stay at the apartment and she would make arrangements for someone to pick her up. She explained that she did not want to be at the apartment alone with him, so she would leave and let him stay.

The victim said that Ms. Tosch and Mr. Wood came to the apartment for approximately twenty minutes, and she sent a text message to a friend to ask the person to come pick her up. She testified that she drank the six-pack of beer while waiting for her friend. She recalled that the defendant opened the last bottle for her while she was using the restroom. The victim said that after she finished the beer, she asked Ms. Tosch to go to a nearby store to buy her a soda. She agreed that she had "a buzz" after she finished the beer, but she denied that she was drunk. The victim said that she sent a text message to a friend

approximately ten minutes after Ms. Tosch left to get the soda. She testified that she remembered a few minutes passing after she sent the message to her friend, who did not respond right away, and then she had no memory of what happened next. She said that her best estimate was that her last memory was at approximately 10:30 p.m.

The victim testified that she would have remembered if someone had asked her whether she wanted to have sex. She said that the defendant never said anything to her about sex, nor did he "come on to [her]" or touch her in anyway. She stated that if he had asked her to have sex or made any suggestion about having sexual relations, she "would have said no[, and] made him start walking."

The victim testified that her next memory after 10:30 p.m. was waking up in her bed at 7:00 a.m. the following morning. She recalled that she had on the tank top and bra that she had on the previous day, but her pants and underwear were off. The victim said someone was kissing her neck when she woke up, and when she turned to see who it was, she saw the defendant. She testified that she jumped out of bed, and the defendant told her that they had sex. She responded that she had not consented and that she did not remember anything. The victim recalled asking the defendant whether there was any semen in her, and "he said he pulled out." She testified that she had been on her menstrual cycle and had been using tampons, but no tampon was inserted when she woke up. She agreed that someone would have had to remove it.

The victim said that she dressed and went outside because she was upset. She went upstairs and knocked on Ms. Tosch's door, but no one answered. As she was coming downstairs, she saw Johnny Proctor walking up to her. The victim said that she was crying, and Johnny Proctor asked what was wrong. She told him that the defendant had sex with her without her consent and that she did not remember anything. He responded, "Well, sometimes guys do that when they are drunk." The victim said that she had to go back into her apartment to get her purse and keys so that she could pick up her son, and the defendant was sitting in the living room. She testified that he told her, "I'm sorry."

The victim testified that she left and drove to Ms. Bishop's house to pick up her son. She said that Johnny Proctor and the defendant followed her to Ms. Bishop's house in Johnny Proctor's vehicle. When she arrived at Ms. Bishop's house, Ms. Bishop invited Johnny Proctor and the defendant to come inside. The victim asked Ms. Bishop to step outside with her, and she told Ms. Bishop what happened. Ms. Bishop asked Johnny Proctor and the defendant to leave her house. As he was leaving, the defendant said, "I'm sorry; that is not me." Johnny Proctor told her that Daniel Proctor was at a residence in Fayetteville, Tennessee. The victim said that she wanted to see Daniel Proctor because Ms. Bishop had related to her a conversation that Ms. Bishop had with the defendant.

The victim testified that she and Ms. Bishop went to Fayetteville. Daniel Proctor was not at the residence, so she called the Fayetteville Police Department and told them what happened in Lewisburg. They advised her to go to Lewisburg to file a report, which she did. She testified that she arrived at the Lewisburg Police Department at approximately 11:00 a.m. on June 7, 2009. She identified the defendant in a photo lineup at the Lewisburg Police Department that day. She also went to a hospital, where the staff drew her blood and collected a rape kit. The victim testified that she did not have any physical injuries.

Cherry Bishop testified that she was a friend of the victim. She met the victim at the rock quarry on June 6, 2009, after the victim invited her. She did not stay long. Ms. Bishop testified that later that evening, the victim and the defendant came to her house, and the victim asked her to watch her son that night. She agreed to watch the victim's son, and she had a conversation with the defendant. She could not recall whether she gave him her phone number or whether the victim had, but she received a text message from him that night. They sent text messages back and forth, and the defendant asked whether he could see her the next day. The defendant also told her that the victim did not want him at the victim's apartment. She received the last text message from him that night between 9:00 and 10:00 p.m.

Ms. Bishop testified that the defendant sent her a text message the following morning to ask if he could come to her house, and she responded that he could. She said that the victim and the defendant came to her house at the same time, and Johnny Proctor came in five minutes later. Ms. Bishop said that she had assumed that the victim and the defendant had taken the same vehicle over to her house because they arrived at the same time. Ms. Bishop testified that the victim pulled her outside and talked to her. After their conversation, Ms. Bishop talked to the defendant, and "[h]e said that he was messed up, and she was messed up, and he thought that it was consensual . . . ." Over the defendant's objection to hearsay, Ms. Bishop testified that the defendant said that "Daniel told him that if he was to get [the victim] drunk, he could do something with her. But he also said that was not his intentions." He also told her that Daniel Proctor told him to go home with the victim.

Denise Tosch testified that in June 2009, she and her boyfriend, Eric Wood, lived in the apartment above the victim. She knew both the victim and Daniel Proctor. Ms. Tosch testified that on June 6, 2009, the victim invited her and Mr. Wood to go to the rock quarry. She said that they arrived at the rock quarry at 1:00 p.m. and stayed until 2:30 p.m. She spent almost the entire time with the victim. Ms. Tosch recalled that the victim "maybe had a couple of beers." Ms. Tosch testified that after she and Mr. Wood left the rock quarry, they went to his son's baseball game and returned home in the early evening. She remembered that it was still daylight when they arrived at home. Ms. Tosch said that she and Mr. Wood visited the victim in the victim's apartment. She stated that it was daylight at the time, and

the defendant was also at the victim's apartment. She said that the first time she had seen the defendant was at the rock quarry that day. Ms. Tosch remembered that the victim was sitting on her couch, wearing long pants, and the defendant was in a recliner. She agreed that "everything seem[ed] all right at that time." Ms. Tosch and Mr. Wood returned to their apartment, and Mr. Wood took a nap. Ms. Tosch said that she went back to the victim's apartment some time after dark for five to ten minutes. She testified that the victim "wasn't drunk" at that time, and she agreed that the victim had "all of her faculties about her." Ms. Tosch stated that the victim wanted a soda, and she told the victim she would get her a soda from the vending machine at a nearby grocery store. Ms. Tosch drove to the store, got the soda, and returned to the victim's apartment within five minutes. When she returned, she walked into the victim's apartment and observed that the victim "was passed out on the couch, and [the defendant] was sitting next to her." She said that the victim was not able to communicate with her, and the defendant did not say anything to her, either. She gave the soda to the defendant and left. Ms. Tosch testified that she "just thought . . . [the victim] was tired, more tired than I thought." She further testified, "I honestly didn't think anything of it. I assumed that she had known him." Ms. Tosch said that when Mr. Wood awoke from his nap approximately one hour later, she told him about going to get the victim a soda and how the victim did not wake up when she came back with the soda. She said that Mr. Wood suggested that they go downstairs to check on the victim. Ms. Tosch testified that they went downstairs and "peeked in [the victim's] window." She said it was dark inside, and she did not see anyone. They tried to open the door, but it was locked. She testified that she did not have any reason to believe that the defendant was still at the victim's apartment at that time, and she recalled that the victim had been trying to find someone to pick up the defendant. On June 7, 2009, the victim told her what had happened, and the police were at the victim's apartment.

Eric Wood testified that he knew the victim because his girlfriend, Denise Tosch, lived in an apartment above her. He said that on June 6, 2009, the victim invited him and Ms. Tosch to go to the rock quarry. They arrived at approximately 1:00 p.m. and stayed until approximately 3:00 p.m., when he and Ms. Tosch left to go to his son's baseball game. Mr. Wood recalled speaking with Daniel Proctor while at the rock quarry, but he did not recall speaking with the defendant. After the baseball game, they returned home, and he took a nap. Mr. Wood said that when he awoke, Ms. Tosch told him that the defendant was with the victim in the victim's apartment. Ms. Tosch related to him that the victim was uncomfortable with the defendant's being there. He went downstairs "to see what was going on." Mr. Wood said that the victim was standing outside of her apartment trying to contact someone to pick her up. The defendant was inside the victim's apartment sitting on the couch. Mr. Wood said that he was concerned about the situation and that the victim was not intoxicated at the time. He stayed downstairs for ten to fifteen minutes and returned to Ms. Tosch's apartment. Mr. Wood testified that at 11:00 p.m. or 12:00 a.m., he went back to the

victim's apartment to check on her. He knocked on the door and tried to turn the doorknob. Mr. Wood said that the door was locked, so he went to the front of the apartment to try to look through the window. He did not see anyone inside of the apartment. Mr. Wood said that the window was open, and he yelled inside to see if anyone was there. He testified that Ms. Tosch was either with him when he was checking on the victim or she came down with him to try for a second time. Mr. Wood testified that on June 7, he went outside of his apartment because he saw police vehicles. The victim told him what happened. A police officer showed him a photo lineup, from which he identified the defendant as the person he had seen inside the victim's apartment.

The parties stipulated that Dr. Dennis McCracken and Nurse Norma Collins collected a rape kit from the victim on June 7, 2009, which Detective James Johnson submitted to the Tennessee Bureau of Investigation ("TBI"). The parties further stipulated that Detective Johnson collected buccal swabs from the defendant, which he sent to the TBI.

TBI Special Agent John W. Harrison testified that he was a forensic toxicologist. He performed a basic drug screen on the victim's blood, and he concluded that the victim's blood was negative for any basic drug. Agent Harrison testified that common date rape drugs leave the body within one to two hours of ingestion. He said that if a person has had alcohol prior to ingesting a date rape drug, the drug "can have a more profound effect." He testified that a drug screen might not have detected date rape drugs in the victim's system due to the period of time that elapsed before the victim's blood was drawn at 2:00 p.m. on June 7. Agent Harrison testified that TBI Agent Dawn Swiney analyzed the victim's blood for ethyl alcohol and found no alcohol present. Agent Harrison explained that the body eliminates approximately one serving of alcohol each hour and stated that it was "not unreasonable that a person would have alcohol [thirteen] hours before and find none [thirteen] hours later in the bloodstream."

Laura Lee Staples testified that she was a former special agent forensic scientist with the TBI. She tested the victim's vaginal swabs, taken as part of the rape kit, and found the presence of semen and sperm. She testified that the DNA in the sperm matched the defendant's DNA.

Lewisburg Police Detective James Johnson testified that he talked with the victim at the police department on June 7, 2009. He went to her apartment to take photographs and took the victim to the hospital for the rape kit. Detective Johnson prepared a photo lineup that he showed to the victim, Ms. Bishop, and Mr. Wood, each of whom identified the defendant. He spoke with the defendant on June 9, 2009, at the police department. He advised the defendant of his *Miranda* rights, and the defendant waived his rights and agreed to talk to the detective. The defendant gave him a statement, which he reduced to writing. Detective Johnson read the defendant's statement as follows:

On Saturday, [June 6, 2009], at around 4:00 p.m., we, Johnny Proctor and myself, met my brother, Daniel Proctor, [the victim], and their son . . . , at the rock quarry. We were hanging out, fishing and swimming. We were sitting around drinking. While I was there, I drank about a 12-pack of Bud Light. [The victim] was drinking a 40-ounce Bud Light.

When we got finished swimming, we decided to go out for the night. We had planned for all of us to meet at [the victim]'s house and leave from there. [The victim] and I left together and went to [Ms. Bishop]'s house to drop off [the victim's son]. We left [Ms. Bishop]'s house and went to [the victim]'s house. [The victim] drove to her house.

When we got there, I went inside and sat on the couch. [The victim] handed me a beer out of the refrigerator. [The victim] was walking around, trying to get a hold of Daniel and Johnny. While we were waiting on Daniel and Johnny, I drank two beers, and [the victim] drank three.

While we were there, a friend of [the victim]'s came to the apartment to see [the victim]. [The victim] got mad because she couldn't get in touch with Johnny or Daniel. When her friend left, [the victim] came over and sat down on the couch next to me. When she sat [down] on the couch, [the victim] was extremely intoxicated. She was talking to me, but her speech was slurred and she was hard to understand. She leaned her head over on to my shoulder, and I started kissing her.

[The victim] got up off of the couch, and I grabbed her around the waist with one hand and had her hand with the other hand and helped her to the bedroom. When we got into the bedroom, she laid down on her back. [The victim] couldn't talk back when I asked her questions. [The victim] unbuttoned her pants, and I got on top of her and pulled her pants off. I pulled her panties off one leg. I got on top of her, in between her legs, and started having sex with her. At this time, she was so messed up, she couldn't talk or respond. When I ejaculated on the sheets, I rolled over, put my underwear back on, and went to sleep.

The next morning, I woke up when I felt her move. She rolled over and asked, did we do anything last night.

I said yes.

She asked if I used a condom, and I said no, but I pulled out.

[The victim] got up and left the room, and I put my shoes on to leave.

She came back in and asked, where are you going? We laid back down and went back to sleep.

When we woke up again, I told her I was sorry for what I had done. She asked if I pulled out, and I said yes; why, did you have any condoms[?]

She said she did.

I got up and Johnny came to pick me up. [The victim] went outside and talked to Johnny. When she came back in, I left.

During the time we were drinking together, the more I drank, the more desirable [the victim] became towards me. [The victim] was incapable of making any decisions about us having sex at the time we did, because of being intoxicated. I am very sorry about what happened, and if I could, I would have never done this to [the victim]. I was also intoxicated, too.

On cross-examination, Detective Johnson testified that he found no physical evidence that indicated the use of a date rape drug.

On re-direct examination, Detective Johnson testified that he did not go through the victim's trash can or "pull the traps off" of the sink and commode.

Following the close of proof and deliberations, the jury found the defendant guilty on both counts of rape, which the trial court merged into one Class B felony conviction. The trial court sentenced the defendant as a Range II, violent offender to fifteen years in the Tennessee Department of Correction. The trial court denied the defendant's motion for new trial, and the defendant filed a timely notice of appeal.

**Analysis**

I. Hearsay

For his first issue, the defendant argues that the trial court erred by admitting a third-party hearsay statement into evidence. Specifically, the defendant contends that the testimony from Cherry Bishop that related a statement from the defendant regarding something Daniel Proctor had told him could not be used to prove the defendant's intent because the state of mind hearsay exception only applies to the state of mind of the declarant,

the declarant being Daniel Proctor. The state responds that the testimony was not hearsay because it was not offered to prove the truth of the matter asserted.

Generally, decisions regarding the admission of evidence are left to the sound discretion of the trial court. *State v. Saylor*, 117 S.W.3d 239, 247 (Tenn. 2003). "[T]rial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion." *Id.* However, "[w]hether the admission of hearsay statements violated a defendant's confrontation rights is . . . a pure question of law." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that testimonial hearsay statements violate a defendant's rights under the federal constitution's Confrontation Clause and are only admissible when (1) the declarant is unavailable and (2) the defendant has had a prior opportunity to cross-examine the declarant. 541 U.S. at 68-69; *see also State v. Maclin*, 183 S.W.3d 335, 345 (Tenn. 2006), *abrogated by State v. Cannon*, 254 S.W.3d 287 (Tenn. 2008). When hearsay is non-testimonial, the Tennessee Rules of Evidence govern its admissibility. *Franklin*, 308 S.W.3d at 810. Non-hearsay statements - *i.e.* statements not admitted for the truth of the matter asserted - do not violate the Confrontation Clause, whether or not the statements are testimonial. *Id.*

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 802 provides that hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Two exceptions to the hearsay rule that are relevant in this case are the party-opponent admission exception and the state-of-mind exception. Tenn. R. Evid. 803((1.2),(3)). When a statement involves hearsay within hearsay, the separate parts of the statement must each conform with a hearsay exception. Tenn. R. Evid. 805.

In this case, the state elicited testimony from Cherry Bishop that the defendant told her that "Daniel told him that if he was to get [the victim] drunk, he could do something with her." The defendant also told Ms. Bishop, according to her testimony, that Daniel Proctor told him to go home with the victim and that it "was not his intentions" to go through with Daniel Proctor's suggestion. The trial court ruled that Daniel Proctor's statement was not hearsay because the state was not offering it for the truth of the matter asserted but to show the defendant's *mens rea*.

Initially, we note that the defendant's statements to Cherry Bishop, other than his statement of what Daniel Proctor said, were admissible as party-opponent admissions, and the defendant did not challenge their admissibility at trial. Tenn. R. Evid. 803(1.2). The statement at issue is what Daniel Proctor said to the defendant, as related by the defendant

-10-

to Ms. Bishop. We agree with the trial court that the statement was not hearsay because the state was not offering the statement for the truth of the matter asserted. The matter asserted was that the victim was sexually available when intoxicated. The state did not offer the statement to prove that the victim was in fact sexually available when intoxicated but rather to prove that the defendant believed the statement to be true and acted accordingly. *See State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (concluding that the victim's statement regarding his sobriety was not probative for the truth of the matter asserted but was admissible to provide evidence of the defendant's motive for committing the offense). Because the state did not offer the statement as substantive evidence, the statement was not hearsay and did not violate the defendant's right to confrontation. Therefore, he is without relief as to this issue.

## II. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his conviction. Specifically, he contends that the state did not prove that the defendant intended to rape the victim.

It is well established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); see also Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given to the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The Tennessee Code Annotated defines rape as the "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by" one of the enumerated circumstances. Tenn. Code Ann. § 39-15-503(a). The state alleged two alternate theories of the offense in this case. The first theory was that the unlawful sexual penetration "[was] accomplished without the consent of the victim and the defendant [knew] or [had] reason to know at the time of the penetration that the victim did not consent." *Id.* at § 39-15-503(a)(2). The second theory was that "[t]he defendant [knew] or [had] reason to know that the victim [was] mentally defective, mentally incapacitated or physically helpless." *Id.* at § 39-15-503(a)(3).

Viewed in the light most favorable to the state, the evidence presented at trial showed that the victim, who had been drinking beer throughout the afternoon, passed out on her couch on June 6, 2009. Denise Tosch testified that she visited the victim's apartment and observed the victim sitting on her couch and the defendant sitting in a recliner. She left the victim's apartment to get a soda for the victim and returned five minutes later. When she returned, the victim was passed out on the couch with the defendant sitting next to her. The victim did not have any memory of anything that occurred between approximately 10:30 p.m. and 7:00 a.m. the following morning. When she awoke, she realized that her pants and underwear had been removed, as well as the tampon she had been wearing the night before. The defendant was lying next to her in the bed, and he admitted that he had sex with her. The victim testified that she never consented. Forensic examination revealed the presence of the defendant's sperm in her vagina. In the defendant's statement to the police, he admitted to having had sex with the victim when she "was incapable of making any decisions about . . . having sex." His statement reveals that he sexually penetrated the victim (1) knowing that she had not consented because, according to him, she could not make such a decision and (2) when she was "mentally defective, mentally incapacitated or physically helpless" because of her intoxication. Tenn. Code Ann. § 39-15-503(a)(3). Therefore, we conclude that the evidence was sufficient for the jury to find the defendant guilty of rape.

**Conclusion**

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE